UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

| | |
|---|---|
| Poultry Borderless Company, LLC, | Case No. 20-cv-1054 (WMW/LIB) |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANTS'** **MOTION TO DISMISS** |
| Darrin Froemming, Trent Froemming, and TFC Partners, LLC, | |
| Defendants. | |

---

This matter is before the Court on Defendants' motion to dismiss for lack of subject-matter jurisdiction. (Dkt. 13.)  For the reasons addressed below, Defendants' motion is granted and this matter is dismissed without prejudice.

## BACKGROUND

Plaintiff Poultry Borderless Company, LLC (PBC) is a Texas limited liability company that has two members, Mauricio Elizondo and Mario Gorena, both of whom are Mexican nationals who live in Monterrey, Mexico.  Defendant TFC Partners, LLC (TFC Partners), is a Minnesota limited liability company.  TFC Partners has two members, Defendants Darrin Froemming and Trent Froemming, both of whom reside in Minnesota.  PBC is a 50 percent owner of TFC Poultry, LLC (TFC Poultry), and TFC Partners currently owns the other 50 percent interest in TFC Poultry.

PBC is affiliated with Productora de Bocados Carnicos S.A. (Productora) and CPD Alimentos S.A. (CPD Alimentos) (collectively, Proboca), one of the leading suppliers of meat products in Mexico.  The Froemmings met the principals of Proboca, Elizondo and

Gorena, at a poultry processing plant trade show in Georgia. The Froemmings then visited Proboca's facilities in Mexico and approached Elizondo and Gorena shortly thereafter about forming a joint venture between Proboca and TFC Poultry. The Froemmings requested that Proboca infuse capital into TFC Poultry and provide valuable knowledge, know-how, and training to help save TFC Poultry, which at that time struggled financially.

On April 22, 2015, the Froemmings, Elizondo, and Gorena executed a Letter of Intent outlining the terms of a joint venture. The Froemmings were to create one separate entity, and Elizondo and Gorena were to create another entity that would serve as the members and owners of TFC Poultry. The parties intended that the Froemmings' separate entity would initially own 49 percent and Elizondo and Gorena's entity would own 51 percent of TFC Poultry. The Letter of Intent provided that the Board of TFC Poultry would comprise five directors, three of whom would represent Proboca's 51 percent ownership interest and two of whom would represent TFC Partners's 49 percent ownership interest.

TFC Poultry signed two promissory notes on October 26, 2015, one in favor of CPD Alimentos for the sum of $403,631.98, and the other in favor of Productora for the sum of $675,900.76 (collectively, the Proboca Notes). The annual interest rate on both notes was 3.25 percent, and neither note specified a schedule for repayment or penalized early payments. On November 1, 2015, the Froemmings entered into a Membership Interest Purchase Agreement (Purchase Agreement), which provided for PBC's purchase of 25.5 percent ownership in TFC Poultry from each of the Froemmings. The Purchase Agreement also provided the Froemmings the right and option to repurchase 1 percent of the ownership

in TFC Poultry from PBC upon written notice and TFC Poultry's repayment of the Proboca Notes.

PBC and the Froemmings executed the Operating Agreement of TFC Poultry, effective October 31, 2015. The Froemmings collectively held a 49 percent ownership interest in TFC Poultry and PBC held a 51 percent ownership interest. Under the Operating Agreement, Darrin Froemming was appointed Chief Officer/Manager and President of TFC Poultry, and his salary was set at $85,000 per year with an annual 2 percent increase. Trent Froemming was appointed Operations Manager, Vice President, and Officer-at-Large, and his salary was set at $80,000 per year with an annual 2 percent increase. Elizondo was appointed Treasurer/Manager, an unsalaried position.

TFC Poultry is "board-managed," and section 5.1 of the Operating Agreement named the initial Governors: Trent Froemming, Darrin Froemming, Mauricio Elizondo, Mario Gorena, and Jose Luis Ayala. Section 5.2 of the Operating Agreement clarified the Board composition as follows:

> Effective as of the date of this Agreement, there shall be five Governors. In the event that Poultry Borderless Company, LLC, conveys a 1% interest in the Company to Trent Froemming and Darrin Froemming or TFC Partners, LLC, resulting in a total ownership interest of 50% for Trent Froemming and Darrin Froemming or TFC Partners, LLC, the number of Governors shall be reduced to four. Said Governors shall consist of the following if they are currently acting as Governors: Mauricio Elizondo, Mario Gorena, Trent Froemming, and Darrin Froemming.

Effective January 1, 2016, the Froemmings assigned their membership interest in TFC Poultry to TFC Partners. In January 2017, the Froemmings invested capital into TFC

Poultry in the form of a loan from Froemming Properties, LLC, a company owned by Darrin Froemming, Trent Froemming, and other members of the Froemming family. The parties agreed that the new Froemming Properties note, as well as the prior Proboca Notes, would receive regular monthly payments at a fixed amount to be paid over a three-year term. The Froemming Properties note was for a principal amount of $400,000 with a 15 percent interest rate and a maturity date of January 15, 2020. But TFC Poultry had the right to prepay the note at any time without penalty. Darrin Froemming signed the note on behalf of TFC Poultry and Trent Froemming signed as President of Froemming Properties.

According to TFC Poultry's January 18, 2017 Board Minutes, payments on the Proboca Notes were to commence in May 2017 and payments on the Froemming Properties note were to commence in February. The same minutes also reflect TFC Poultry's payment approval process: for payments up to $10,000, the CEO (Darrin Froemming) would have authority; for payments between $10,000 and $30,000, additional approval from Gorena would be required; and any payments over $30,000 would require Board authorization.

TFC Poultry's performance improved markedly after PBC's involvement began, rising from a negative net income of approximately $445,000 in 2015, to a positive net income of $1,300,000 in 2019. In early 2019, the Froemmings advised PBC that they expected losses for the year of more than $750,000. Defendants offered to purchase PBC's interest in TFC Poultry for approximately $210,000, a fraction of the actual value of PBC's 51 percent interest in TFC Poultry, which had an estimated value between $6 million and $7 million at the time. In presenting the offer, Defendants declared that the offer would be reduced by $25,000 in two weeks and would be reduced by an additional $25,000 every

4

week thereafter. According to PBC, the loss projections were the first step in the Froemmings' plan to squeeze out PBC and deprive PBC of the value of its investment.

As 2019 was proving to be a successful year, the Froemmings began demanding significantly higher salaries for themselves, but an agreement was never reached. PBC alleges that, after the Froemmings failed in their demands to buy out PBC for an unfairly low price and in their demands for increased salaries for themselves, the Froemmings set out to unlawfully seize control of the Board, force a deadlock in TFC Poultry's governance, and deny PBC's right to financial information.

Alfonso Cabanas replaced Jose Luis Ayala on the Board in April 2019, and Carlos Guajardo replaced Mauricio Elizondo in November 2019. Cabanas and Guajardo participated in numerous Board votes and actions without any objection by Defendants. PBC alleges that the Froemmings devised a scheme to claim a right to control the Board, which involved secretly arranging for early payment of the Proboca Notes by TFC Poultry without the Board's knowledge or approval. Until late November 2019, TFC Poultry's primary bank account to which PBC has access and signature authority was with Wells Fargo. Defendants subsequently moved TFC Poultry's primary bank account to an account at Village Bank in which PBC had neither online access nor signature authority.

On the afternoon of February 25, 2020, the Froemmings directed Viking Bank to make wire transfers totaling $44,570.05 from TFC Poultry's account to pay off the Proboca Notes ahead of the agreed-upon payment schedule. By the end of the day on February 26, 2020, the Froemmings exercised their option to acquire the additional 1 percent ownership of TFC Poultry and assigned it to TFC Partners. These transactions were accomplished

without informing PBC, the Governors, or TFC Poultry's Treasurer, despite the Board having held its regularly scheduled meeting on the morning of February 26, 2020. The Froemmings signed the documents exercising the option to acquire the additional 1 percent ownership interest nine minutes after the conclusion of the Board's telephonic hearing. The Froemmings' lawyer sent a letter by email to PBC and the Governors moments later, advising that the Froemmings had paid off the remaining balance of the Proboca Notes and exercised their option to purchase the additional 1 percent ownership interest.

The email from the Froemmings' lawyer also declared on behalf of the Froemmings that the Board now consisted of only three members—not four or five as indicated by the Operating Agreement—based on the Froemmings' interpretation of Section 5.2. According to the Froemmings' lawyer, Elizondo's earlier replacement as an initial Governor meant that the Board now consisted of only the Froemmings and Gorena.

On February 27, 2020, the Froemmings sent PBC and the fellow Governors a Written Action in Lieu of a Meeting of the Board of Governors of TFC Poultry (Written Action), signed by the Froemmings. According to PBC, the Written Action radically changed the direction of TFC Poultry by reversing a resolution to pay $40,000 monthly in owner's draws, revoking a resolution that TFC Poultry would not sell products in Mexico, and removing Elizondo from his position as Treasurer. All of these "illegitimate" actions, PBC alleges, were designed to give Defendants control of TFC Poultry, in violation of PBC's rights, to give Defendants' leverage over PBC so that PBC would accede to Defendants' strategy for more compensation, and to elevate Defendants' personal interests over those of TFC Poultry. PBC also alleges that Defendants acted in their own interests,

in violation of their duties to PBC.  As an example of Defendants' conflicts of interests, PBC contends that Defendants carried out their Board control scheme so as to allow the Froemmings to gain personally by receiving more compensation.  Moreover, PBC maintains that the Froemmings, without authority, used TFC Poultry's funds to pay off early the low-interest-rate Proboca Notes that had an interest rate of 3.25 percent, rather than paying off the high-interest-rate Froemming Properties note that was accruing interest to the Froemmings' affiliate at a rate of 15 percent.

In addition, PBC alleges that the Froemmings cut off PBC's access to important financial information and oversight, including access to TFC Poultry's server and the Viking Bank account.  The Froemmings sent a Written Action to Gorena on April 24, 2020, that purported to be a TFC Poultry resolution hiring an independent consultant to act as a Board committee.  The Froemmings authorized the independent consultant to recommend higher compensation for them, including modifications that extend retroactively to January 1, 2018.

PBC commenced this action against Defendants, asserting claims for declaratory judgment, breach of fiduciary duty, breach of contract, breach of the covenant of good faith and fair dealing, and breach of the duty to provide access to financial information as required by Minn. Stat. § 322C.0410.  Defendants move to dismiss the action for lack of subject-matter jurisdiction.

## ANALYSIS

PBC invokes the Court's jurisdiction under 28 U.S.C. § 1332, which confers federal subject-matter jurisdiction when the matter in controversy exceeds $75,000 and the parties

are citizens of different states. Complete diversity of citizenship is necessary and exists when no defendant holds citizenship in the same state that any plaintiff holds citizenship. *OnePoint Sols., LLC v. Borchert*, 486 F.3d 342, 346 (8th Cir. 2007). For purposes of diversity jurisdiction, an LLC's citizenship is the citizenship of each of its members. *Id.*

"[D]iversity of citizenship is determined by reference to the parties named in the proceeding before the district court, as well as any indispensable parties who must be joined pursuant to Rule 19" of the Federal Rules of Civil Procedure. *Northport Health Servs. of Ark. v. Rutherford*, 605 F.3d 483, 486 (8th Cir. 2010) (internal quotation marks omitted). Joinder or omission of an indispensable but nondiverse party requires dismissal. *Merchants Nat'l Bank of Winona v. Hartford Accident & Indem. Co.*, 377 F. Supp. 1344, 1345 (D. Minn. 1974). The parties agree that TFC Poultry's citizenship is both Mexico and Minnesota. Defendants argue, and PBC does not dispute, that diversity jurisdiction will not exist if TFC Poultry is joined as a party to this lawsuit.

A party is indispensable and must be joined in an action if the district court "cannot accord complete relief" in that party's absence. Fed. R. Civ. P. 19(a)(1)(A). If an indispensable party cannot be joined, the district court must determine whether, "in equity and good conscience," the action should proceed among the existing parties or be dismissed. Fed. R. Civ. P. 19(b).

An entity is distinct from its stockholders and holds the separate right to sue in its own name. *In re Medtronic, Inc. S'holder Litig.*, 900 N.W.2d 401, 406 (Minn. 2017). A derivative action allows a shareholder to bring suit against wrongdoers on behalf of the entity and force liable parties to compensate the entity for injuries caused. *In re*

8

*UnitedHealth Grp. Inc. S'holder Derivative Litig.*, 754 N.W.2d 544, 550 (Minn. 2008). A business entity, such as an LLC, is an indispensable party when a derivative claim is brought on behalf of the business entity. *See Buckley v. Control Data Corp.*, 923 F.2d 96, 98 (8th Cir. 1991) (concluding that plaintiff-partners' claims against the limited partnership were derivative, which made the limited partnership an indispensable party, and that joining the limited partnership destroyed diversity of citizenship). Accordingly, at issue here is whether PBC's claims are direct or derivative.

Under the Minnesota Revised Uniform Limited Liability Company Act (Minnesota LLC Act), Minn. Stat. §§ 322C.0101 *et seq.*, an LLC member may "maintain a direct action against another member, a manager, a governor, or the limited liability company to enforce the member's rights and otherwise protect the member's interests, including rights and interests under the operating agreement." Minn. Stat. § 322C.0901, subdiv. 1. An LLC member maintaining a direct action "must plead and prove an actual or threatened injury that is not solely the result of an injury suffered or threatened to be suffered by the limited liability company." *Id.* at subdiv. 2. The Minnesota LLC Act also permits an LLC member to bring a derivative action to enforce a right of a limited liability company. Minn. Stat. § 322C.0902.

When determining whether an action is direct or derivative, a district court examines who suffered the injury and what party is entitled to recovery. *In re Medtronic*, 900 N.W.2d at 409. When shareholders are injured only indirectly, the action is derivative; but, when

shareholders show an injury that is not shared with the corporation, the action is direct.[1] *Id.* It is the *injury* itself that matters when making this determination, not the theory on which the claim is based. *Id.* at 407 (citing *Wessin v. Archives Corp.*, 592 N.W.2d 460, 464 (Minn. 1999)).

Defendants argue that PBC's dispute over the composition of TFC Poultry's Board is unquestionably a derivative claim that must be brought on behalf of TFC Poultry. Defendants contend that the harm PBC alleges—specifically, revoking the Mexico resolution, removing Elizondo as Treasurer, revoking a prior Board decision that authorized member draws, and establishing an independent committee to review the Froemmings' compensation—stems from a primary dispute over TFC Poultry's Board composition.

PBC counters that it has asserted direct claims against Defendants to protect PBC's rights under the Operating Agreement, and any recovery or relief ordered by the Court would benefit PBC. PBC contends that Guajardo's removal from the Board, after surreptitious payments on the Proboca Notes, directly injured PBC by breaching Section 5.2(a) of the Operating Agreement. In its complaint, PBC alleges four general harms: (1) the removal of a duly appointed Governor (Guajardo) from the TFC Poultry's Board in an attempt to control TFC Poultry, (2) the removal of Elizondo as Treasurer, (3) the obstruction of PBC's access to TFC Poultry's financial information and bank accounts, and

---

[1] The law relevant to corporations guides the interpretation and application of the law that is relevant to LLCs. *Stone v. Jetmar Props., LLC*, 733 N.W.2d 480, 486 (Minn. Ct. App. 2007).

(4) the refusal of TFC Poultry's Board to pay members distributions that previously had been authorized by the Board.[2]

Guajardo's removal from the Board is a derivative claim. A stockholder may sue because the corporation is under the control of an alleged wrongdoer but, in doing so, must sue in a representative capacity for the benefit of the corporation, *not* for personal damages. *Wessin*, 592 N.W.2d at 464 (citing *Seitz v. Michel*, 181 N.W. 102, 205 (Minn. 1921). When addressing shareholder claims, the Minnesota Supreme Court also has held that claims based on an alleged diversion of corporate funds are derivative claims. *In re Medtronic*, 900 N.W.2d at 408 (citing *Seitz*, 181 N.W. at 105). The court reasoned that, although "the additional allegation of a conspiracy to 'freeze out' the plaintiff-shareholder 'may have been directed against the plaintiff[,] . . . [the defendants'] acts resulted ultimately in the dissipation of corporate funds." *Id.* (quoting *Seitz*, 181 N.W. at 106). Here, regardless of any conspiracy to freeze out PBC, the alleged injury is the removal of Guajardo from the Board, which PBC maintains was done in breach of the Operating Agreement and the Board's fiduciary duties. That Guajardo's interests happen to align with PBC's interests is immaterial.

---

[2] The Court construes the injury or harm alleged in PBC's complaint, not PBC's characterization of the harm suffered. *See In re Medtronic*, 900 N.W.2d at 409–10 (construing the injuries as alleged in ten counts of the complaint to include three general types of harm); *accord Recruiting Force, LLC v. Mainthia Tech., Inc.*, No. A-19-CV-1045-RP, 2020 WL 1698826, at *3 (W.D. Tex. Apr. 8, 2020) ("The determination of whether a claim is a derivative claim or a direct claim is made by reference to the nature of the wrongs alleged in the complaint, and is not limited by a party's characterization or stated intention." (internal quotation marks omitted)).

The Minnesota LLC Act, Minn. Stat. §§ 322C.0101 *et seq.*, is an adaptation of the Revised Uniform Limited Liability Company Act (RULLCA). *Compare* Minn. Stat. § 322C.0101 *et seq. with* Revised Unif. Ltd. Liab. Co. Act §§ 101 *et seq.* (Unif. Law Comm'n 2013). The statutory provision for a direct action by a member against another member, manager, or the LLC, Minn. Stat. § 322C.0901, is substantively identical to Section 801 of the RULLCA. And the commentary addressing Section 801(b) of the RULLCA explains that a member has no direct claim against a manager or another member merely because the manager or other member has breached the operating agreement. Revised Unif. Ltd. Liab. Co. Act § 801 cmt. at 159; *accord TIFD III-X LLC v. Fruehauf Prod. Co.*, 883 A.2d 854, 859–60 (Del. Ch. 2004) (the fact that only the partners, and not the partnership, are the parties to the partnership agreement does not transform one party's breach of the agreement into a direct harm to the other). Rather, to have standing to sue in its own right, a member plaintiff must be able to show a harm that occurs independently of the harm suffered by the company. Revised Unif. Ltd. Liab. Co. Act § 801 cmt. at 159.

PBC's arguments do not align with Minnesota law. Citing *Practice Benefits, LLC v. Entera Holdings, LLC*, 797 S.E.2d 250 (Ga. Ct. App. 2017), PBC argues that an action for breach of fiduciary duties against a manager of a limited liability company may be brought as a direct claim if the plaintiff alleges an injury that is different from the other shareholders. But Minnesota law has not "establish[ed] a requirement that a shareholder's injury must be separate and distinct from any injuries to all other shareholders to bring a direct action, as some states have held." *In re Medtronic*, 900 N.W.2d at 408–09. PBC also relies on caselaw from other jurisdictions, which is neither controlling nor free from

12

being distinguishable. *See, e.g.*, *Muccio v. Hunt*, No. CV-11-1273, 2014 WL 346929, at *10–11 (Ark. Jan. 30, 2014) (holding that fraud claims by members of an LLC against other members of the LLC were direct claims, rather than derivative, when the alleged fraud in the inducement to join the company arose before the formation of the entity); *ATT Sys. Co. v. Tylman*, No. 03 C 50326, 2004 WL 2674278, at *3–4 (N.D. Ill. Oct. 14, 2004) (addressing claims that were not based on the loss of value of plantiffs' investment, but instead based on defendants' wrongful inducement of the plaintiffs' investment in the corporation in the first place, which were "direct and distinct injuries" to plaintiffs as investors).

PBC also argues that its claims are direct because each claim seeks to remedy injuries suffered by PBC alone. But PBC cannot demonstrate that the Board's purported decision to remove Guajardo directly injured PBC because PBC does not allege that this action affected its membership interests. Nor could PBC, because PBC has no voting rights on the Board under the Operating Agreement and PBC alleges no loss in its 50 percent ownership interest in TFC Poultry. *Cf. In re Medtronic*, 900 N.W.2d at 411 (concluding that plaintiff's alleged injury based on loss of certain rightful incidents of ownership interest is an injury that falls on the shareholders). The Board purported to remove a Governor—*not PBC's Governor*. PBC cannot pick and choose when to follow corporate formalities.

Ultimately, PBC's claims relate to alleged mismanagement and breach of fiduciary duties.[3] Derivative causes of action under state law for breach of fiduciary duties traditionally have provided the principal remedy of stockholder recovery of damages for corporate waste and mismanagement. *Abbey v. Control Data Corp.*, 603 F.2d 724, 731 (8th Cir. 1979). Mismanagement, like a breach of a partner's fiduciary duty, is the type of claim that must be brought derivatively because it causes an injury to the partnership. *Agostino v. Hicks*, 845 A.2d 1110, 1123 (Del. Ch. 2004) (concluding that a claim of mismanagement, if proven, represents a direct wrong to the corporation that is indirectly experienced by all shareholders).

In summary, TFC Poultry is an indispensable party because PBC alleges a derivative claim on behalf of TFC Poultry.[4] Consequently, dismissal is required for lack of subject-matter jurisdiction.[5] *Northport Health Servs.*, 605 F.3d at 486; *Merchants Nat'l Bank*, 377 F. Supp. at 1345. The Court expresses no opinion as to the merit of PBC's claims.

---

[3] The removal of Elizondo as Treasurer shares the same analysis as the removal of Guajardo from the Board. Both are claims of alleged mismanagement that directly injured TFC Poultry, and only indirectly injured PBC. *See In re Medtronic*, 900 N.W.2d at 409 (the action is direct if shareholders show an injury that is not shared with the corporation).

[4] Regardless of practicality, the fact that all members of TFC Poultry are involved in this action does not change the conclusion that TFC Poultry is an indispensable party. *See Trademark Retail, Inc. v. Apple Glen Inv'rs, LP*, 196 F.R.D. 535, 541–42 (N.D. Ind. 2000) (holding that LLC was a necessary and indispensable party, necessitating dismissal of the suit for lack of diversity despite all of the LLC members involved in the suit because LLCs are separate legal entities with rights and obligations distinct from those of its members); *accord Weber v. King*, 110 F. Supp. 2d 124, 128 (E.D.N.Y. 2000).

[5] The Court is mindful that it has discretion to sever any claim against a party. *See* Fed. R. Civ. P. 21. However, assuming without deciding that any of PBC's claims are direct claims, the Court declines to sever those claims here because each claim arises from

**ORDER**

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED**:

1.  Defendants' motion to dismiss, (Dkt. 13), is **GRANTED**.

2.  This matter is **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter jurisdiction.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  February 2, 2021                               s/Wilhelmina M. Wright
                                                       Wilhelmina M. Wright
                                                       United States District Judge

---

the same nucleus of operative facts, and it is in the interest of justice, fairness and judicial economy that the claims be tried together. *McClure v. Raymond Corp.*, 174 F. Supp. 2d 982, 986 (E.D. Mo. 2001).